[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11118
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-00267-CG-M

ERLEND TANGEN,

Plaintiff-Appellee,

versus

IDEACOM OF THE GULF COAST, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(October 21, 2014)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

Ideacom of the Gulf Coast, Inc. (Ideacom) appeals the district court's award of $110,500.70 in damages, plus applicable attorney's fees and costs, following a bench trial in Erlend Tangen's suit seeking payment of sales commissions stemming from his prior employment with Ideacom.  For the reasons that follow, we affirm in part and reverse and remand in part.

I.

Tangen started work as a healthcare sales representative with Ideacom in 2002.  His compensation included an annual base salary of $33,000 and a 5 percent commission on individual sales.  In late 2008, Ideacom altered the structure of its commissions program with a one-page written document titled "Sales Compensation Program" (the Program).  Under the Program, commissions were payable in two installments—a front-half payment of 2.5 percent due when a customer signed a sales contract, and a back-half payment that was payable when the customer paid in full and ranged from 0.5 to 3.5 percent depending on a particular sale's profitability.

After Tangen resigned in 2011, Ideacom refused to pay back-half commissions on multiple sales that Tangen had orchestrated before his departure. In response, Tangen filed a diversity suit alleging a violation of the Alabama Sales

Commission Act, Ala. Code § 8-24-1 (the Act), and breach of contract.[1]

Following a bench trial, the district court entered judgment in favor of Tangen with an award of $110,500.70, plus attorney's fees and costs. Specifically, the court awarded Tangen $106,407.96 on his breach-of-contract claim, and $4,092.74 for his claim under the Act. After the parties fully briefed the issue of attorney's fees, the court awarded Tangen an additional $50,805 in attorney's fees under the Act and $3,359.88 in costs. This is Ideacom's appeal.

## II.

We review factual findings made by a district court after a bench trial for clear error, which is a highly deferential standard of review. *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005); Fed.R.Civ.P. 52(a). We review conclusions of law made by a district judge following a bench trial *de novo*. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (Review for clear error "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law") (citation omitted). "This court reviews an award of attorney's fees for abuse of discretion; nevertheless, that standard of review still allows us to closely scrutinize questions

---

[1] Tangen also raised a negligence claim in his amended complaint, but the district court granted Ideacom's motion for summary judgment on this count. The court further granted summary judgment in favor of Ideacom against of all Tangen's claims under the Act, with the exception of a single sale to Griffin Electric.

3

of law decided by the district court in reaching a fee award." *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1304 (11th Cir. 2001) (citation omitted).

On appeal, Ideacom raises the following arguments: (1) the district court erred in holding that it was liable for the payment of commissions to Tangen after his resignation; (2) the district court erred as a matter of law in holding that the Act applies to a commission on the sale of supplies to a contractor; (3) there was insufficient evidence to support the district court's finding that the Act applies to Ideacom's sale to Griffin Electric; and (4) the district court should have restricted the award of attorney's fees solely to time Tangen spent on proving his one successful claim under the Act. We consider each argument in turn.

## III.

### A. Post-Resignation Commissions

The parties agree that Alabama law controls their dispute concerning Tangen's eligibility for post-resignation commissions based on the terms of the Program. *See Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011) ("As a federal court sitting in diversity jurisdiction, we apply the substantive law of the forum state . . . alongside federal procedural law."). "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the

4

defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So.3d 872, 880 (Ala. 2009) (citation omitted).

Ideacom argues that the district court erred in concluding that Tangen was entitled to back-end commissions based solely upon the execution of a sales contract because Tangen resigned before installing the products or ensuring that the systems were operational and compliant with local code provisions. Tangen counters that he earned his back-half commissions by securing sales contracts prior to his resignation, and that the terms of the Program did not explicitly require that Tangen remain in Ideacom's employment at the time a customer paid in full in order to receive his back-half commissions. We first note that the text of the Program contains no language that expressly conditions payment of back-half commissions on the performance of post-sale duties or provides for forfeiture of back-half commissions upon resignation. Thus, an ambiguity clearly exists in the contract's terms relating to the payment of commissions after an employee voluntarily terminates his or her employment.

Once a court decides that a contract is ambiguous, the determination of its meaning is for the factfinder, the trial court in this case. *Miles College, Inc. v. Oliver*, 382 So.2d 510, 511 (Ala. 1980). All of the circumstances leading to the agreement, including the interpretation placed on the language of the parties, are to be considered in ascertaining the intention of the parties. *Hartford Accident v.*

5

*Morgan Cnty. Ass'n*, 454 So.2d 960, 961 (Ala. 1984).  "And, where the evidence is received ore tenus, the findings of fact by the trial court after a determination that ambiguity exists in the contract are to be accorded a heavy presumption of correctness, and they will not be disturbed unless palpably wrong."  *Creative Leasing, Inc. v. Canon*, 496 So.2d 79, 81 (Ala. Civ. App. 1986).

Turning to the instant appeal, there was sufficient evidence from which the trial court reasonably could have concluded that the parties intended commissions earned during Tangen's course of employment to be payable after his resignation. *See Lindy Mfg. Co. v. Twentieth Century Mktg.*, 706 So.2d 1169, 1175 (Ala. 1997) (holding that a sales representative was entitled to commissions on certain sales that were made after the termination of his employment).  At trial, Tangen testified that he was paid back-half commissions on three of the twelve sales listed on his final commissions statement, even though there is no dispute that another company salesman, Ron Schrader, ultimately was responsible for oversight of installation. In a customer email, Ideacom's President, John Robb, explained that Tangen's role in a sale ended with the presales discussions; other employees were responsible for the "installation and implementation" of Ideacom's products.  Robb also testified that the motivation behind implementing the terms of the Program was to incentivize profitable sales and accurate sales quotes.  But Robb made no mention about compensating his sales representatives for performing post-sale duties.

6

Moreover, Doug Tomberlin, an Ideacom salesman also subject to the terms of the Program, testified that back-half commissions are earned as soon as a job is billed, and not when a customer pays in full.

Based on this record, the district court did not err by determining that both front-end and back-end commissions were paid primarily as an incentive for pricing out profitable sales, and that a salesperson's duty to perform post-sales duties was merely a collateral duty unrelated to the payment scheme. *See Creative Leasing, Inc.*, 496 So. 2d at 80-81 (noting that evidence of a payment structure that varied based on the number of sales made rather than customer complaints handled supported a finding that commissions were earned by making sales, not by performing "collateral" post-sale duties that were "unrelated to compensation").

In its appellate brief, Ideacom argues at length that the district court erred in holding that evidence related to Tangen's H-1B employment visa[2] was irrelevant to the contract analysis. Specifically, Ideacom maintains that Tangen was obligated to perform every job duty listed in his H-1B petition, including "meeting with nursing and engineering professionals to design a nurse-patient communication system," and "supervising the installation, meeting with hospital personnel and seeing that the system gets programmed." We disagree. Although Tangen was expected to fulfill the general duties outlined in his H-1B job

---

[2] Tangen, a native and citizen of Norway, was granted a "specialty occupation" H-1B employment visa in 2004 to work for Ideacom as a healthcare sales representative.

7

description, there is nothing to indicate that these duties were tied to his commission payments, either pre- or post-resignation, as opposed to maintaining his employment status.

In sum, the district court properly concluded that Tangen was entitled to back-end commissions on sales he made before he resigned from Ideacom, and we affirm the court's award of $106,407.96 on his breach-of-contract claim.

B. Alabama Sales Commission Act

Ideacom next argues that the district court erred by holding that the Act applies to a commission on the sale of supplies to a contractor. Specifically, Ideacom asserts that the sale of a nurse call system to Griffin Electric for installation into a nursing home was simply a retail sale, and thus, did not fall under the provisions of the Act, which is limited to wholesale transactions.

Alabama is one of 33 states that have enacted laws to protect commissions earned by sales representatives. *See RMC & Assocs., Inc. v. Beasley*, 958 So.2d 879, 882 (Ala. Civ. App. 2006). Section 8-24-3 of the Alabama Code is a penalty provision dealing with "Sales Representative's Commission Contracts." Ala. Code § 8-24-3. As relevant to this appeal:

> The [Act] requires that commissions 'due at the time of termination' be paid within 30 days, but it also requires that commissions yet to accrue be paid within 30 days of the date on which they become due. Clearly, the [Act] contemplates that a sales representative is to be paid commissions that accrue on accounts that, because of his or her efforts

8

> on behalf of the principal, continue to provide business to the principal following termination of the representative.

*Lindy Mfg. Co.*, 706 So.2d at 1174.  The Act further provides that, if a principal fails to pay a sales representative's commission when it is due, the principal "is liable to the sales representative in a civil action for three times the damages sustained by the sales representative plus reasonable attorney's fees and court costs."  Ala. Code § 8-24-3.

In order for Ideacom to meet the definition of a "principal" under the Act, the company was, *inter alia*, required to sell "to customers who purchase the product or products for resale."  Ala. Code § 8-24-1(2).  Additionally, in order for Tangen to meet the definition of a "sales representative," he needed to solicit "orders for the purchase at wholesale of the product . . . ."  *Id.* § 8-24-1(3).  The Alabama Court of Civil Appeals has defined the term "wholesale," as applicable to the Act, as follows: "The plain and ordinary meaning of the word 'wholesale' . . . denotes the sale of a product for resale."  *RMC & Assocs. Inc.*, 958 So.2d at 883 (citation omitted).  The crux of Ideacom's argument on appeal is that the Griffin Electric transaction did not constitute a sale at the wholesale level, and thus

9

the district court erred by awarding Tangen treble damages plus attorney's fees under the provisions of the Act.[3]  We agree.

At trial, the district court relied on the following evidence to support its finding that the Griffin Electric sale fell within the scope of the Act: (1) the invoice for the sale indicated that the product was delivered to Mountain View Nursing Home (Mountain View), the end-user of the product; (2) Ideacom's president testified that the system was installed at Mountain View; (3) on direct examination, Tangen described, without objection, that he sold the system to Griffin Electric, which in turn "resold" the item to Mountain View.  But there is nothing in the record to show that Griffin Electric executed a resale of the nurse call system to Mountain View. *See RMC & Assocs., Inc.*, 958 So.2d at 884 (noting that because the Act imposes treble damages and is thus penal in nature, it "must be strictly construed").  Rather, the sale invoice and testimony from Ideacom's President simply illustrate that Griffin Electric purchased the nurse call system from Ideacom in order to install the equipment into a nursing home.

In Alabama, the transfer of building materials into completed structures generally are not considered sales.  *See, e.g.*, Ala. Admin. Code r.

---

[3] Ideacom's revenue on the Griffin Electric sale amounted to $81,854.82.  Based on a 2.5 percent rate, the district court calculated that Tangen was due a back-end commission of $2,046.37.  Based on the treble-damages provision in § 8-24-3, the amount owed became $6,139.11.  The district court ultimately reduced this award by a third to reflect that $2,046.37 of this amount already had been included in Tangen's recovery for breach of contract.

10

810-6-1-.27(1) (2013) (noting that "contractors and builders do not sell the building materials they use and that sales to them are taxable under sales and use tax laws"). Citing to provisions of the Alabama Tax Code, Ideacom argues that the sale of the nurse call system to Griffin Electric as part of the construction of a nursing home constitutes a retail sale of building supplies to a contractor. *See* Ala. Code § 40-23-1(a)(1) ("Sales of building materials to contractors, builders, or landowners for resale or use in the form of real estate are retail sales in whatever quantity sold.").

The record supports Ideacom's position. At trial, Tangen testified that the Griffin Electric sale was for "a new construction project" of a nursing home. Tangen also introduced the Ideacom sales invoice, which listed the sale price as $81,000 and noted that Griffin Electric paid a ten percent retail tax on the transaction. The mere fact that Griffin Electric paid a retail tax on the nurse call system, however, did not automatically render the transaction a retail sale. Rather, the payment of the retail tax demonstrates that the transaction complied with the Tax Code. *See* Ala. Admin. Code r. 810-6-1-.27. In any event, Tangen failed to present any evidence to show that Griffin Electric "resold" the nurse call system to Mountain View. He simply opined, without supporting documentation, that Griffin Electric was "an

electrical contractor and they sell products to hospitals and other buildings, other people."

The district court labeled the nurse call system at issue in the Griffin Electric sale as "medical equipment" without further comment.  But the record evidence shows that the system is more akin to a building material. Tomberlin, an Ideacom employee, testified that the nurse call system included a patient station that was affixed to the wall, an emergency pull station installed in the restroom, and cabling infrastructure, which consisted of a head-end electrical closet, a communications closet, and cabling for all devices.  *See* Ala. Admin. Code r. 810-6-1.28(1) (2013) (describing "building materials" as "all tangible personal property, including any device or appliance vised by builders, contractors, or landowners in making improvements, additions, alteration or repair to real property in such a way that such tangible personal property becomes identified with a part of realty.").

Based on this record, we conclude that the Griffin Electric sale constituted a single sale between Ideacom and Griffin Electric rather than a wholesale transaction subject to resale.  *See State v. Algernon Blair Indus. Contractors, Inc.*, 362 So.2d 248, 251 (Ala. Civ. App. 1978) (noting that a contractor under Alabama law is considered a "user or consumer").  As

such, we reverse the district court's order granting Tangen $4,092.74 under the Act and remand for entry of judgment in favor of Ideacom on this count.

C. Attorney's Fees

Because the Act did not apply to the Griffin Electric sale, we need not address Ideacom's argument that the district court abused its discretion by awarding $50,805 in attorney's fees based on factoring counsel's time spent working on all of Tangen's claims under the Act, as opposed to restricting the award to time spent on the Griffin Electric sale. The district court's authority to award attorney's fees originates under the Act. *See* Ala. Code § 8-24-3. Having reversed the court's order granting Tangen relief under the Act, we also reverse the award of attorney's fees under the Act.

**AFFIRMED in part; REVERSED and REMANDED in part.**